# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

PET FRIENDLY, INC.,                    :

      Plaintiff,                   :

vs.                                    :        CA 06-0642-C

THE CATAPULT GROUP,                    :
L.L.C., et al.,

                             :

      Defendants.

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on the defendants' motion to dismiss for want of *in personam* jurisdiction (Doc. 4), plaintiff's response to the defendants' motion (Doc. 8), and the defendants' response (Doc. 12). The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings, including disposition of this motion. (Doc. 10 ("In accordance with provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 11 (order of reference)) Upon consideration of the contents of the briefs and all pertinent materials submitted in support of the

briefs, the Court **DENIES** the defendants' motion to dismiss.

## FINDINGS OF FACT

1.      In July of 2005, Rick Peterson, president and sole member of the Catapult Group, L.L.C. (Doc. 4, Affidavit of Richard Peterson, at ¶ 2), contacted Pet Friendly, Inc. in Alabama "regarding the possibility of . . . providing marketing services for Pet Friendly." (Doc. 8, Declaration of Teresa Weinacker, at ¶ 2; *but cf.* Doc. 12, Exhibit A, Affidavit of Richard Peterson, at ¶¶ 5-6 ("Catapult was introduced to Pet Friendly, Inc. [] in approximately July 2005 by Denise Browning, who was a mutual friend of mine and an officer[] of Pet Friendly. Ms. Browning made arrangements for this meeting after she was informed that Pet Friendly was looking to increase distribution and sales and to grow their business. I did not solicit Pet Friendly for this meeting. The main purpose of my July 2005 visit to south Alabama was to visit Ms. Browning. She thought it would be convenient while I was in the area to visit Pet Friendly. The meeting with Pet Friendly in July 2005 lasted approximately one and a half hours."))

2.      On July 18, 2005, Peterson met with principals of Pet Friendly in Fairhope, Alabama and made certain representations about what he and his company could do for Pet Friendly. (Doc. 8, Weinacker declar., at ¶ 3) "In

particular, Peterson made specific representations regarding his extensive training, experience and knowledge in the areas of sales and marketing." (*Id.* at ¶ 6)

3.    Subsequent to Peterson's trip to Alabama, he sent to Pet Friendly in Alabama a proposed Independent Contractor Agreement (*id.*, at ¶ 5), same reading, in relevant part, as follows:

> This INDEPENDENT CONTRACTOR AGREEMENT (this "Agreement") is made and entered into as of the 29th day of August (the "Effective Date"), by and between THE CATAPULT GROUP, LLC, a Texas limited liability company (hereinafter called "Contractor"), whose business address is 5839 Boca Raton Drive, Dallas, Texas 75230, and PET FRIENDLY, INC, an Alabama corporation (hereinafter called "Company").
>
> .    .    .
>
> WHEREAS, Company is a corporation organized and existing under the laws of the State of Alabama for the purpose of designing, manufacturing, marketing, and selling pet supplies; and
>
> WHEREAS, Contractor, by virtue of his extensive training and experience, is a consultant particularly knowledgeable in the areas of sales and marketing; and
>
> WHEREAS, Company believes that the consulting services of Contractor in the future would be of great value to Company, and therefore, desires to retain him as an independent contractor; and
>
> WHEREAS, Contractor has indicated a willingness and

desire to provide certain services to Company under the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises and agreements herein contained, the undersigned parties do hereby covenant and agree as follows:

1.     CONTRACTOR'S SERVICES.   Company agrees to retain Contractor to manage all of Company's current national and regional accounts, except Wal-Mart Stores, as well as potential new accounts in the following industries: pet supplies and distribution, mass merchandisers, drug stores, feed and tractor stores, convenience stores, truck stops, travel stores and grocery stores. Contractor shall also be charged with the responsibility of enhancing web based revenue and services and any new products and services, line extensions, co-op or co-branded items and marketing on behalf of the Company (all such services are collectively referred to herein as the "Services").

2.     NATURE OF RELATIONSHIP.   It is understood and agreed that Contractor is an independent contractor and not an employee, agent, joint venturer, or partner of Company. Contractor shall determine the methods, details, and means of providing the Services. Company is interested only in the result to be accomplished by Contractor and shall have no right to control the manner or determine the method by which such Services are provided.

3.     TERM.       The initial term of this Agreement shall commence on the Effective Date and shall be for one (1) year. This Agreement shall automatically renew for an additional term of one (1) year unless either party terminates the Agreement upon written notice to the other at least sixty (60) days prior to the expiration of the initial term hereof.

4.     COMPENSATION FOR SERVICES.

(a)     Company shall pay Contractor, as compensation

4

for all consulting and sales services rendered in this Agreement, a fixed weekly fee of one thousand one hundred and fifty-five and No/100 dollars ($1,155.00), which amount shall be paid on a weekly basis in accordance with Company's normal payroll procedure.

(b)     In addition, Contractor shall be paid three percent (3%) (the "Commission") on all gross revenue derived from the sale of Company's products to accounts managed by Contractor, including but not limited to, all such new revenue generated from Company's website. The Commission shall be paid to Contractor within thirty (30) days following receipt of payment from Company's customer. Company's obligation to pay the Commission shall survive termination of this Agreement for a period of twelve (12) months.

5.     <u>NO WITHHOLDING OF TAXES</u>.     No payroll or employment taxes of any kind (including but not limited to, FICA, FUTA, federal or state personal income taxes, state disability insurance taxes, and state unemployment insurance taxes) shall be withheld or paid with respect to any payments to Contractor, it being understood and agreed that Contractor shall be solely responsible for all of the above type obligations and others that are the obligations of persons who are self-employed. Due to the nature of the relationship between the parties, Contractor acknowledges that he is not an employee, and therefore, not entitled to any benefits paid by Company to its employees, including but not limited to, vacation pay, holiday pay, profit sharing, unemployment insurance, and worker's compensation insurance.

6.     <u>PAYMENT OF EXPENSES</u>.     Except as stated herein, Contractor shall be fully and solely responsible for all costs and expenses incident to the Services furnished to Company under this Agreement, including but not limited to, all costs of training, materials, fees, licenses, taxes (including but not limited to, federal, state and local income taxes, FICA,

FUTA, workers compensation, and unemployment insurance taxes), and all of Contractor's other costs of doing business. Company shall reimburse Contractor for reasonable travel expenses submitted and properly substantiated, including but not limited to, airfare, mileage, auto rental, gasoline, hotel expenses, meals and all travel and business entertainment related expenses. All other expenses, besides such travel expenses listed hereinabove, shall be the sole responsibility of Contractor. Such expenses shall be reimbursed to Contractor within fifteen (15) days of submission to Company of Contractor's expense report.

.     .     .

10.    OWNERSHIP INTEREST IN COMPANY.    Upon the successful completion of the recapitalization of Company and/or buyout of Company's two (2) existing minority owners, (whose interests currently total forty-eight percent (48%) of the ownership of Company), Company shall grant to Contractor five percent (5%) ownership interest in Company. Upon Company reaching total revenues of four million dollars ($4 million) and five million dollars ($5 [m]illion) respectively, Contractor shall be granted five additional percent ownership in Company for attaining each of the $4 million and $5 million dollar revenue objectives, collectively totaling fifteen percent (15%) ownership interest. Company shall transfer the 15% Interest to Contractor upon terms and conditions mutually agreed upon by the parties, provided however, that in no event shall Contractor be required to contribute cash for such 15% Interest.

.     .     .

12.    ENTIRE AGREEMENT.    This Agreement constitutes the full and complete understanding and agreement of the parties, and all covenants, promises and representations are merged and incorporated herein.

13.    GOVERNING LAW.    This Agreement shall be governed by, and is to be construed according to, the laws of the

State of Texas.

(Doc. 4, Exhibit B, INDEPENDENT CONTRACTOR AGREEMENT, at 1-2 & 3) Teresa Y. Weinacker, in her capacity as President of Pet Friendly, executed this contract in Alabama (Doc. 8, Weinacker declar., at ¶ 5); on October 20, 2005, Peterson executed the agreement in Texas (*compare* Doc. 4, Exhibit A, Peterson aff., at ¶ 14 *with* Doc. 4, Exhibit B). The parties later revised the agreement to reflect a change in the commencement date of the agreement from August 29, 2005 to October 24, 2005. (Doc. 4, Exhibit B, Revision to Independent Contractor[] Agreement) Only three days after the new revision date, that is, on October 27, 2005, Teresa Weinacker penned a lengthy e-mail to the office staff at Pet Friendly, a portion of which references Peterson: "I think everyone has met Rick Peterson . . . . Rick has been hired as Senior Vice President of Sales at Pet Friendly, Inc. I would like each of you to assist him in any way that helps generate more sales. From time to time he will make suggestions on how to improve different things – please do not take it as criticism but as one professional's advice or opinion to another professional. Do not be afraid to bring up your own opinions to him. He is awaiting your thoughts and comments on a Mission Statement for Pet Friendly, Inc. Please e-mail these to him at rickp@petfriendly.com." (Doc. 12,

Exhibit 1, at 2)

    4.    Since the initial execution of the independent contractor agreement, Peterson "has traveled to Alabama to meet with Pet Friendly personnel regarding the business of Pet Friendly on approximately five separate occasions." (Doc. 8, Weinacker declar., at ¶ 7; *but cf.* Doc. 12, Peterson aff., at ¶ 10 ("I returned to Alabama to visit Pet Friendly in October 2005 and January 2006."))

    5.    On July 3, 2006, Costco Wholesale placed a purchase order with Pet Friendly for an identified quantity of a rope toy for shipping to its office in Dallas, Texas. (Doc. 8, Exhibit A to Weinacker declar.) Pet Friendly manufactured the rope toys in Alabama and delivered the goods to a Costco truck in Fairhope for delivery to Dallas. (Doc. 8, Exhibit 1, Weinacker declar., at ¶ 9 & Exhibit B to Weinacker declar.) Pet Friendly sent an invoice to Costco's headquarters in Seattle, Washington for payment terms of net 30 days. (Exhibit C to Weinacker declar. & Weinacker declar., at ¶ 10) Subsequently, Pet Friendly requested payment from Costco and learned that Peterson had requested the vendee to change the purchase order and to pay to The Catapult Group the monies owed for the goods Pet Friendly delivered to Costco. (Weinacker declar., at ¶ 11; *see* Exhibit D to Weinacker declar.)

6.     Pet Friendly filed suit against Peterson and The Catapult Group on September 8, 2006 in the Circuit Court of Baldwin County, Alabama. (Doc. 1, Exhibit B, COMPLAINT)

## COUNT ONE
### (Fraud in the Inducement & Misrepresentation)

.     .     .

5.     Plaintiff Pet Friendly was induced to enter into an independent contractor agreement with Defendant Catapult based on representations by President Rick Peterson of his personal expertise in selling and marketing as well as Catapult's expertise in selling and marketing.

6.     At the time of contracting, Defendants made material misrepresentations to the Plaintiff and its representatives. Defendants[] knew or should have known these representations to be false and/or misleading to induce Plaintiff to rely on these statements.

7.     Pet Friendly believed and reasonably relied on the misrepresentations and/or omissions and suffered damages as a result.

8.     Pet Friendly paid over $20,790.00 in payments to Catapult based on the fraudulently induced contract.

WHEREFORE, Plaintiff Pet Friendly demands judgment against Defendants, for compensatory and punitive damages [in] an amount in excess of this Court's jurisdictional minimum, plus interest, costs, attorneys' fees and any other relief which this Honorable Court deems fair and just.

## COUNT TWO
### (Breach of Contract)

9

.     .     .

10.     The agreement between Catapult and Pet Friendly includes the following provision at ¶ 7: "Limitation of Authority: Contractor shall not have any authority to act on behalf, or to bind, Company in any manner, except as expressly authorized in writing by the Company."

11.     In breach of this provision, Rick Peterson, as an agent of Catapult, represented that he was also an employee and/or director and/or officer of Pet Friendly with authority to bind Pet Friendly.

12.     His representations worked to the detriment of Pet Friendly.

13.     Plaintiff has been damages (sic) as a proximate result of the Defendants['] actions.

WHEREFORE, Plaintiff Pet Friendly demands judgment against the Defendants, for compensatory and punitive damages [in] an amount in excess of this Court's jurisdictional minimum, plus interest, costs, attorneys' fees and any other relief which this Honorable Court deems fair and just.

## COUNT THREE
(Conversion)

.     .     .

15.     Pet Friendly and CostCo entered into an agreement by which CostCo would pay $104,457.60 for pet supplies.

16.     At the direction of the Defendants[] the purchase program agreement between CostCo and Pet Friendly was altered to divert payment from Pet Friendly to Defendants without the permission of Pet Friendly.

WHEREFORE, Plaintiff Pet Friendly demands judgment against Defendants, jointly and severally[,] for compensatory and punitive damages [in] an amount in excess of this Court's jurisdictional minimum, plus interest, costs, attorneys' fees and any other relief which this Honorable Court deems fair and just.

(*Id*. at 1-3)

7.     In support of the motion to dismiss, the defendants have filed two affidavits sworn to by Rick Peterson, the first of which reads in relevant part as follows:

2.     I am now, and, at all times relevant to this lawsuit have been the president, and sole member, of The Catapult Group, L.L.C. (Catapult).

3.     The Catapult Group, L.L.C. is a Texas Limited Liability Company with its principal place of business in Dallas, Texas.

4.     I, individually, am a resident of the state of Texas.

5.     Neither Catapult nor I owns (sic) any land in Alabama.

6.     Neither Catapult nor I rents (sic) any real estate in Alabama.

7.     Neither Catapult nor I have an office or employees in Alabama.

8.     Neither Catapult nor I have a phone listing in Alabama nor does Catapult or I have a post office box in Alabama.

9.     Catapult has never qualified to do business in

11

Alabama.

      10.    Catapult has never designated an agent for service of process in Alabama.

      11.    Neither Catapult nor I have ever filed tax returns for Alabama taxes.

      12.    Neither Catapult nor I have any business activities in Alabama.

(Doc. 4, Exhibit A, Affidavit of Richard Peterson, at ¶¶ 2-12) Because it is now clear to the Court that Peterson was, and perhaps still is, an officer and putative employee of Pet Friendly,[1] this defendant cannot in perfect sincerity aver that he has neither an office or phone listing in Alabama nor that he has never conducted any business activities in Alabama.

## CONCLUSIONS OF LAW

      1.    *In personam* jurisdiction in this action, against these non-resident defendants, is predicated upon Alabama's long-arm statute which, in part, provides:

> An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this

---

[1]    The Court completely appreciates the contents of the independent contractor agreement; however, it appears that the parties disregarded those contents when Peterson was named Senior Vice President of sales for Pet Friendly.

> state is not inconsistent with the constitution of
> this state or the Constitution of the United
> States[.]

Ala.R.Civ.P. 4.2(b).

2.      In a diversity action, like the present one (*see* Doc. 1, ¶ 12 ("This

Court has original jurisdiction of the above-entitled action pursuant to 28

U.S.C. § 1332, and since defendants are not resident[] citizens of the state of

Alabama, wherein the above-entitled action is pending, removal of this action

to this Court is proper pursuant to 28 U.S.C. § 1441(a)."), "a federal court may

assert jurisdiction over a nonresident defendant only to the extent permitted by

the long-arm statute of the forum State, and only if the exercise of jurisdiction

comports with the requirements of the Due Process Clause of the Fourteenth

Amendment." *Vermeulen v. Renault, U.S.A. Inc.*, 975 F.2d 746, 753 (11th Cir.

1992), *opinion modified and superseded on other grounds by Vermeulen v.

Renault, U.S.A., Inc.,* 985 F.2d 1534 (11th Cir.), *cert. denied sub nom. Regie

Nationale des Usines Renault S.A. v. Vermeulen*, 508 U.S. 907, 113 S.Ct.

2334, 124 L.Ed.2d 246 (1993);  *see also Olivier v. Merritt Dredging Co., Inc.*,

979 F.2d 827, 830 (11th Cir. 1992) (panel of the Eleventh Circuit states that

in determining whether a district court may assert personal jurisdiction

depends upon whether the district court could obtain personal jurisdiction over

the defendants pursuant to the applicable state long-arm statute and whether

the exercise of personal jurisdiction would violate the due process clause of the

Fourteenth Amendment), *cert. denied sub nom. South Carolina Property &*

*Casualty Ins. Guar. Ass'n v. Olivier*, 507 U.S. 983, 113 S.Ct. 1577, 123

L.Ed.2d 145, and *cert. denied sub nom. Louisiana Ins. Guar. Ass'n v. Olivier*,

508 U.S. 910, 113 S.Ct. 2342, 124 L.Ed.2d 252 (1993).  Where, as here, the

courts of the forum State have interpreted the forum's long-arm statute to

confer jurisdiction to the limits allowed by federal due process, *Mutual Service*

*Ins. Co. v. Frit Industries, Inc.,* 358 F.3d 1312, 1319 (11th Cir. 2004)

("Alabama's long-arm statute authorizes Alabama courts to assert jurisdiction

to the fullest extent constitutionally permissible.");  *Ruiz de Molina v. Merritt*

*& Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1355-1356 (11th Cir. 2000)

("Alabama permits its courts to exercise jurisdiction over nonresidents to the

fullest extent allowed under the Due Process Clause of the Fourteenth

Amendment to the Constitution."); *Ex parte Georgia Farm Bureau Mutual*

*Automobile Ins. Co.*, 889 So.2d 545, 550 (Ala. 2004) ("'"Rule 4.2,

Ala.R.Civ.P., extends the personal jurisdiction of Alabama courts to the limits

of due process under the federal and state constitutions."'")*; Ex parte Lagrone*,

839 So.2d 620, 623 (Ala. 2002) ("Rule 4.2, Ala.R.Civ.P., Alabama's long-arm

rule, 'extends the personal jurisdiction of Alabama courts to the limits of due process under the federal and state constitutions.'"), state law need not be applied: this Court "need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process." *Vermeulen, supra*, 975 F.2d at 753; *see also Olivier, supra*, 979 F.2d at 830 ("In interpreting the reach of the state's long-arm statute, the Supreme Court of Alabama has extended the jurisdiction of Alabama courts to the extent permissible under the due process clause of the Fourteenth Amendment. . . . Thus, in order to determine whether the district court in Alabama properly refused to exercise personal jurisdiction, we need only consider whether the exercise of jurisdiction would have satisfied the requirements of due process."); *Morris v. SSE, Inc.*, 843 F.2d 489, 492 n.3 (11th Cir. 1988) ("This case presents no need to examine Alabama's long-arm jurisdictional statute because that statute authorizes a court to assert personal jurisdiction to the limits of federal due process. . . . We recognize that it is well-established in this circuit that in a diversity case, a federal district court adjudicating a motion to dismiss for lack of personal jurisdiction must determine whether assertion of jurisdiction comports with both state law and the due process requirements of the United States Constitution. . . . However, where the forum's courts interpret the forum's

15

long-arm statute to the limits of *federal* due process, we believe it is not necessary to apply state law; application of the federal *International Shoe* two-part analysis will suffice."); *see Mutual Service Ins. Co., supra*, 358 F.3d at 1319 ("[A]s the offshore insurers concede, the sole contested issue in our personal jurisdiction analysis is whether Alabama's exercise of jurisdiction over the offshore insurers violates due process.").

3.      A nonresident defendant is amenable to a forum's jurisdiction if "(1) it possesses sufficient minimum contacts with the forum State to satisfy due process requirements, and (2) the forum's exercise of jurisdiction comports with '"traditional notions of fair play and substantial justice."'" *Vermeulen, supra*, 975 F.2d at 754, quoting in part *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), in turn quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940). As stated in *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) (citations omitted), "[d]ue process requirements are satisfied when in personam jurisdiction is asserted over a nonresident corporate defendant that has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *See also Ruiz de*

16

*Molina, supra*, 207 F.3d at 1356 ("The Due Process Clause permits a court to summon a nonresident to defend himself in the forum so long as that person has some 'minimum contacts' with that state and, the exercise of personal jurisdiction over the defendant would not offend 'traditional notions of fair play and substantial justice.'").

4.      "In assessing a defendant's 'minimum' contacts with the forum state, courts have distinguished between contacts establishing 'specific' and 'general' jurisdiction." *Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1146 (N.D. Fla. 1994) (citations omitted).  When a cause of action is related to or arises out of a nonresident defendant's contacts with the forum, the Supreme Court has held that the "'relationship among the defendant, the forum and the litigation' is the essential foundation of in personam jurisdiction." *Helicopteros, supra,* 466 U.S. at 414, 104 S.Ct. at 1872, quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed. 2d 683 (1977).

> Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. It has long been recognized that a court has the minimum contacts to support specific jurisdiction only where the defendant "purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." The requirement that there be minimum contacts is grounded in fairness. It assures that "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court

there."

*Consolidated Development Corp. v. Sherritt, Inc*., 216 F.3d 1286, 1291 (11th Cir. 2000) (internal citations omitted), *cert. denied*, 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001); *see also Madara v. Hall*, 916 F.2d 1510, 1516 n.7 (11th Cir. 1990) ("Specific personal jurisdiction is founded on a party's contacts with the forum state that are related to the cause of action."). On the other hand, general jurisdiction derives from the defendant's contacts with the forum that are unrelated to the litigation. *Helicopteros, supra,* 466 U.S. at 414-415 n.9, 104 S.Ct. at 1872 n.9; *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n.15, 105 S.Ct. 2174, 2182 n.15, 85 L.Ed.2d 528 (1985) ("'Specific' jurisdiction contrasts with 'general' jurisdiction, pursuant to which 'a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum.'"); *Consolidated Development Corp., supra*, 216 F.3d at 1292 ("General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated."); *Madara, supra*, 916 F.2d at 1516 n.7 ("General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation."). "The due process requirements for general personal jurisdiction are more stringent than for

specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state." *Consolidated Development Corp., supra*, 216 F.3d at 1292.

     5.    Plaintiff affirmatively contends that this Court may exercise general personal jurisdiction over Peterson and The Catapult Group in this case. (Doc. 8, at 4-5) While Peterson's position as Senior Vice President of sales of Pet Friendly, an Alabama corporation, might very well give rise to "continuous and systematic" contacts with Alabama sufficient for this Court's exercise of general personal jurisdiction over the defendants, *but cf. Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1986) ("We conclude that Lovett & Tharpe's contacts with Missouri were not so 'continuous and systematic' as to permit the exercise of general personal jurisdiction over them. Lovett & Tharpe is a Georgia corporation; all the officers are residents of Georgia; and Lovett & Tharpe is not licensed nor has it ever been licensed in Missouri. There is no evidence that Lovett & Tharpe has an office or employees in Missouri, that they solicit business in Missouri, that they provide services or close sales in Missouri, that they sell products to Missouri purchasers, that they purchase products from Missouri sellers (other than in the instant transaction), or that they carry on any other

activity there."); *Morris, supra*, 843 F.2d at 491 n.2 ("We proceed on a theory of specific personal jurisdiction. Snyder's uncontroverted December 8, 1986, affidavit clearly establishes that SSE's contacts with Alabama not related to this suit fail to meet the 'continuous and systematic' contacts required to establish general personal jurisdiction."), this Court need not ground its denial of defendants' motion to dismiss on this basis since it is clear that this Court may exercise specific jurisdiction in this instance.

6.     As alluded to earlier, specific jurisdiction focuses upon whether plaintiff's cause of action arises out of or relates to the non-residents' contacts with the forum state. *Rudzewicz, supra*, 471 U.S. at 472, 105 S.Ct. at 2182 ("Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposely directed' his activities at residents of the forum . . ., and the litigation results from alleged injuries that 'arise out of or relate to' those activities[.]").  This Court can reach no other conclusion but that Pet Friendly's cause of action arises out of the contacts Peterson and The Catapult Group have with Alabama. Plaintiff alleges that defendant Peterson fraudulently induced it into executing the Independent Contractor Agreement and that the defendants diverted away from plaintiff and to

themselves certain monies without Pet Friendly's consent. More specifically, during Peterson's first visits to Alabama in July of 2005, this defendant made representations to plaintiff regarding what he and The Catapult Group could do for Pet Friendly given his extensive training, experience and knowledge in the areas of sales and marketing that induced plaintiff to execute the Independent Contractor Agreement; the allegation, of course, is that these representations were false. Following execution of the agreement,[2] Peterson was named Senior Vice President of sales for Pet Friendly and in that capacity traveled to Fairhope, Alabama on approximately five occasions to meet with other personnel of plaintiff regarding the business of plaintiff. Finally, in his capacity as an officer of Pet Friendly, Peterson contacted a company (Costco Wholesale) who had placed an order for pet supplies with plaintiff and who had accepted delivery of those supplies in Fairhope, Alabama  and requested that payment for the order be made to The Catapult Group as opposed to Pet Friendly.[3] This Court has no hesitancy in concluding that the foregoing activities by the defendants were directed toward Alabama and resulted in injury to Pet Friendly. In other words, this evidence establishes that the

---

[2]        Notably, plaintiff executed the contract in Alabama.

[3]        Plaintiff has asserted a conversion claim against the defendants on the basis of these allegations. (Doc. 1, COMPLAINT, at ¶¶ 15-16)

defendants availed themselves of the privilege of conducting activities within Alabama and, therefore, reasonably should have anticipated being haled into court in this state. Accordingly, the minimum contacts requirement exists for purposes of this Court's exercise of personal jurisdiction over Peterson and The Catapult Group.

7.   In addition to the above,  "considerations of fair play and substantial justice counsel permitting the exercise of personal jurisdiction[.]" *Sun Bank, N. A. v. E. F. Hutton & Co., Inc*., 926 F.2d 1030, 1034 (11th Cir. 1991) (citation omitted); *see Rudzewicz, supra*, 471 U.S. at 477, 105 S.Ct. at 2184 ("These considerations [of fair play and substantial justice] sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."); *Ruiz de Molina, supra*, 207 F.3d at 1358-1359 ("[B]ecause these considerations serve to establish the reasonableness of jurisdiction in this case, a lesser showing of minimum contacts than otherwise would be required is sufficient."). "In determining whether jurisdiction would comport with traditional notions of fair play and substantial justice, the courts look at: (a) 'the burden on the defendant,' (b) 'the forum State's interest in adjudicating the dispute,' (c) 'the plaintiff's interest in obtaining convenient and effective relief,' (d) 'the interstate judicial

system's interest in obtaining the most efficient resolution of controversies,' and (e) 'the shared interest of the several States in furthering substantive social policies.'" *McGow v. McCurry*, 412 F.3d 1207, 1216 (11th Cir. 2005), quoting *Meier ex rel. Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264, 1276 (11th Cir. 2002); *see Ruiz de Molina, supra,* 207 F.3d at 1358 ("Once it is decided that defendants have at least minimum contacts with a forum, the burden is on the defendants to show that the imposition of jurisdiction in the forum is unreasonable. Several factors are relevant to this showing: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies.").

8.    It is clear to the Court that the defendants will not be significantly burdened by having to come to Alabama to defend Pet Friendly's suit given the availability of modern transportation and communication. *See Olivier, supra*, 979 F.2d at 834 ("[A]s the Supreme Court of the United States has noted '. . . modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' . . . The Supreme Court subsequently stated that the

historical developments noted in *McGee* have only accelerated in the generation since that case was decided. . . . Requiring adjudication in Alabama will not impose a substantial burden on LIGA and SCIGA."); *Morris, supra*, 843 F.2d at 495 ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a state where he engages in economic activity."). While Peterson resides in Texas it is clear from the evidence submitted in relation to the instant motion to dismiss that he has traveled to Mobile on numerous occasions for both business and personal matters. Therefore, this Court cannot find that the defendants will be burdened by having to come to this Court to defend this action. Second, Alabama has significant interests in adjudicating a lawsuit involving one of its residents who alleges it was injured in the forum state as a result of the actions of the defendants, particularly given the allegations that defendant made false representations to principals of Pet Friendly in Alabama in order to induce plaintiff to execute the subject contract and diverted monies away from the plaintiff. *See Andersen v. Sportmart, Inc.,* 57 F.Supp.2d 651, 662 (N.D. Ind. 1999) ("States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors."). Third, Pet Friendly has a significant interest in obtaining convenient and effective

relief and it does not appear to this Court that Texas would have as much interest, as would Alabama, in providing such relief since the injury to plaintiff occurred in Alabama as a result of the defendants' contacts with Alabama. *See Morris, supra*, 843 F.2d at 495 ("[O]btaining the most efficient resolution of the controversy suggests that Alabama is an appropriate forum for such a resolution. As the District Court for the Southern District of Mississippi noted when it transferred the case to the Southern District of Alabama, 'It appears that the Southern District of Alabama is the proper venue for this cause. It is where the alleged accident occurred, diversity jurisdiction exists, and a majority of witnesses reside.'"). Fourth, the witnesses and evidence relevant to plaintiff's claims are both in Alabama and Texas but given Peterson's not infrequent trips to Alabama, efficient resolution of this case suggests that jurisdiction be asserted over the defendants in the Southern District of Alabama. *See Andersen, supra*, 57 F.Supp.2d at 663 ("In evaluating [the efficient administration of justice] factor, courts generally consider where witnesses and evidence are likely to be located."). Finally, allowing this case to proceed in this Court arguably will further Alabama's "'interest in providing an effective means of recovery for a resident who has been damaged' by the fraudulent acts of a nonresident." *Berlin v. Newman*, 657 So.2d 890, 892

Ala.Civ.App. 1994) (quoting *Shrout v. Thorsen*, 470 So.2d 1222, 1225 (Ala. 1985)), *cert. denied sub nom. Ex parte Snider*, 657 So.2d 894 (Ala. 1995); *see Ex parte Paul Maclean Land Services*, 613 So.2d 1284, 1287 (Ala. 1993) ("The effect's of a nonresident's activities on the forum state are especially apparent in those cases where there are allegations of *fraud* by the nonresident defendant[.]").

9.     In light of the foregoing, this Court concludes that exercising personal jurisdiction over the defendants in this case would not be unreasonable or inconsistent with the notions of fair play and substantial justice.

10.     Plaintiff has established not only that minimum contacts exist in Alabama over the defendants, such that this Court may exercise specific personal jurisdiction over this matter, it has also established that exercising personal jurisdiction over the defendants in this case would comport with notions of fair play and substantial justice.

## CONCLUSION

The Court **DENIES** the motion to dismiss filed by defendants The Catapult Group, LLC and Rick Peterson for want of *in personam* jurisdiction

(Doc. 4).

**DONE** this the 14th day of November, 2006.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**